# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

_____

ANNE E. PFLUGER,

              Plaintiff,

      v.                                     Case No. 03-C-0710

U.S. GROUP LONG-TERM DISABILITY
INSURANCE PLAN ("LTD") PLAN NUMBER 505
a/k/a THE ANDERSEN LONG TERM DISABILITY
(LTD) PLAN,

ANDERSEN SOCIETE COOPERATIVE, and

AETNA LIFE INSURANCE COMPANY
a/k/a AETNA LIFE AND CASUALTY COMPANY
a/k/a AETNA U.S. HEALTHCARE,

              Defendants.

_____

## ORDER

Plaintiff Anne E. Pfluger filed this action alleging that the defendants violated the

Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.,* by

terminating long-term disability benefits that she received under defendant U.S. Group

Long-term Disability Insurance Plan ("LTD") Plan Number 505 a/k/a The Andersen

Long Term Disability (LTD) Plan ("Plan").[1] Defendants Aetna Life Insurance Company

("Aetna") and the Plan (collectively, "defendants")[2] move for summary judgment. The

---

[1] The Plan alleges that its proper name is Arthur Andersen LLP Group Long-Term Disability Insurance Plan, and that it is an ERISA Plan. (Answer ¶ 2, Mar. 28, 2005.)

[2] Although certain docket entries are labeled as though they were filed by defendant Andersen Societe Cooperative and although Elizabeth A. McDuffie is listed on the docket as the attorney of record for Aetna, the Plan, and Andersen Societe Cooperative, no attorney has filed a notice of appearance on behalf of defendant Andersen Societe Cooperative. The court's reference to "defendants" in this order, therefore, includes only Aetna and the Plan.

defendants also move to strike declarations filed in opposition to summary judgment. For the reasons stated below, the court will grant the motion to strike and deny the motion for summary judgment.

## BACKGROUND[3]

In January 1992, Pfluger started working for Arthur Andersen where she would be promoted to Tax Manager in September 1993. In June 1992, following a trip to the Grand Canyon in which Pfluger stayed overnight unexpectedly in cold weather, Pfluger developed an upper respiratory infection and experienced shortness of breath, chest pain, severe muscle aches and fatigue. Since the June 1992 infection, Pfluger contends that she has continued to experience the following symptoms: forgetfulness, problems with memory and concentration, confusion, difficulty sleeping, muscle aches and pains, fevers, sore throats, headaches, prolonged fatigue after minimal effort, and generalized muscle weakness. In September 1993, Pfluger was first diagnosed with chronic fatigue syndrome. In October 1993, after speaking with her supervisor, Pfluger requested that her hours be reduced to 40 hours per week. In March 1995, Pfluger started working part-time after her doctor put her on a part-time schedule to reduce her stress and to allow her to rest more. Pfluger's workload, however, prevented her from adhering to a part-time schedule.

On March 17, 1996, Pfluger submitted an application for long-term disability benefits under the Plan, claiming that she suffered from chronic fatigue syndrome. In

---

[3]The administrative record is set forth in docket #'s 101-106 as exhibits to the March 22, 2006 Affidavit of Tammy Manente. For ease of reference, the court refers to the documents in these exhibits by their Bates page numbers (e.g. "Bates 1122-23").

2

an Attending Physician's Statement dated March 19, 1996, Scott Rigden, M.D. wrote that Pfluger's symptoms included "exhaustion, fatigue, post-exertional [illegible], headaches, musculoskeletal aches and pains, cognitive dysfunction, recurrent S.T., and swollen glands." (Bates 869.) Rigden described Pfluger's limitations as "muscular weakness, fibromyalgia, marked exercise intolerance; cognitive impairment with physical stress/fatigue." (Bates 870.) By letter dated May 2, 1996, Aetna informed Pfluger of its determination that "at present, you are partially disabled from your usual occupation according to the terms of your group insurance coverage. Therefore, you are eligible for monthly benefits commencing March 8, 1996." (Bates 138.) In June 1996, Deborah Michael, M.D. wrote that Pfluger has "extreme fatigue, weakness, cognitive dysfx [dysfunction]" and was limited to working 20 hours per week "2° [secondary] to fatigue." (Bates 864.) In July 1997, Pfluger stopped working altogether. A note in the administrative record suggests that Pfluger switched from partial to total disability on July 1, 1997. (*See* Bates 453.) Another note in the record suggests that Aetna granted Pfluger full long-term disability benefits without sending a letter to Pfluger regarding its determination. (Bates 450; *see also* Bates 446.) As of July 1997, Pfluger received full long-term disability benefits. On July 29, 1997, Micheal wrote that Pfluger's present capabilities were "no employment 2° [secondary] to ↑ [increased] sys [symptoms] + ↑ cognitive dysfx, fatigue, H.A." (Bates 893.)

Under the Plan, Pfluger receives a percentage of her basic monthly earnings (either 50% or 70% depending upon the premium amount that Pfluger paid Aetna) if

3

she becomes "Totally Disabled" while insured.  (Bates 1168.)  The Plan sets forth the

following definition of "Total Disability/Totally Disabled" that applies to Pfluger:

> For Active Regular Employees with a job class code of manager and above, that solely because of an illness, pregnancy, or accidental bodily injury, an insured employee is unable to perform the material duties of the employee's own occupation.

(Bates 1190.)  The duties of a Tax Reporting Services Manager include:

> Detailed review of tax returns
>
> Sign all types of returns
>
> Identify business/technical issues, resolve or call in consulting personnel
>
> Perform accrual reviews
>
> Supervise preparers
>
> Run jobs, would have specific client responsibility
>
> Coordinate with Director and consulting managers
>
> Evaluate staff
>
> Review Excel spreadsheets and other projects
>
> Run Contract Tax Services engagements
>
> Respond to IRS and state notices
>
> Meet with client/relationship manager to gather information
>
> Billing
>
> Refine budget for specific job
>
> Identify necessary elections and make sure they are included in return
>
> Alert to practice development opportunity

4

Some group operational duties

Internal marketing

(Bates 300.)  The occupation of tax manager is not physically demanding (80% sitting, 5% standing, 5% walking, 5% lifting (not greater than 5 pounds), 2% reaching above shoulders, and 3% reaching below shoulders), but it requires high mental alertness, high stress/pressure, and irregular work hours.  (Bates 299.)  The Plan requires Pfluger to apply, and reapply as necessary, for Social Security Disability benefits.  (Bates 1171.)  If Pfluger receives Social Security Disability benefits, the benefits that Pfluger receives under the Plan are reduced dollar for dollar by the Social Security Disability benefits.  (Bates 1169.)

In accordance with those Plan terms, Aetna required Pfluger to apply for Social Security Disability benefits and put Pfluger in touch with a company called Allsup, Inc. which assisted Pfluger in applying for Social Security Disability benefits.  A Social Security proceeding was held on June 24, 1999, and in a decision dated August 19, 1999, an Administrative Law Judge ("ALJ") determined that Pfluger was disabled, under the meaning of the Social Security Act, since July 1, 1997.  (Bates 263-71.) Specifically, the ALJ determined that Pfluger's chronic fatigue syndrome, fibromyalgia, and migraine headaches prevented her from performing even sedentary occupations on a regular and sustained basis.  (Bates 267.)  The ALJ stated that Pfluger "credibly testified" that she requires "frequent (3-4 times per day) prolonged (1 hour each) breaks during which she will rest while lying down" and that she has three or four "bad days" per week when she is unable to read with any comprehension or recall conversations.

5

(*Id.*) Pfluger testified that she experiences particularly severe pain and swelling in her upper back, shoulder, and neck regions several days each week. Pfluger testified that she experiences migraine headaches four days per month. Pfluger testified that she takes medication for her headaches and other pain. The ALJ determined that medical evidence confirmed Pfluger's testimony regarding the nature and severity of her impairments and her diminished concentration and memory. (Bates 268.) The ALJ noted that Dr. John Moran, a psychologist who evaluated Pfluger in February 1998, suspected that Pfluger's chronic fatigue syndrome would interfere with her concentration and memory if she were required to work on a full-time basis. In September 1998, Dr. Moran noted that Pfluger remained "quite symptomatic" and would become extremely debilitated and fatigued after more than an hour of sustained activity. (*Id.*) The ALJ credited the opinion of Pfluger's treating physician that the severity and persistence of Pfluger's symptoms of fatigue prevented Pfluger from working even part-time. (Bates 269.) The ALJ also found Pfluger's testimony regarding the nature and severity of her symptoms to be "credible." (*Id.*)

Based upon the ALJ's decision, Pfluger received Social Security Disabililty benefits effective December 1, 1997. (Bates 576.) Because Pfluger's receipt of Social Security Disability benefits reduces the benefits that she was entitled to receive under the Plan, Aetna sought and received reimbursement from Pfluger for the overpayments since December 1, 1997, in the amount of $27,582.50. (Bates 24-27, 569-71.)

While Pfluger received benefits under the Plan, Aetna hired MJM Investigations, Inc. to conduct surveillance of Pfluger's activity. (*See* Bates 31-38, 40-44.) On

January 19, 1999, the surveillance reports indicate that Pfluger walked to her mailbox, drove to a medical clinic, and carried a box to her car. On January 20, 1999, an investigator observed Pfluger walking to her mailbox, driving to a medical clinic, carrying a plastic bag in her right arm, and shoveling snow for several minutes. On September 22, 1999, Pfluger walked one mile with her husband. On September 23, 1999, Pfluger walked to her mailbox, drove to the supermarket, and pushed a cart of groceries to her car. Aetna hired Huffmaster Associates, LLC to conduct surveillance of Pfluger's activity from April 26, 2001 to April 28, 2001. (Bates 220-27.) During the three days, Pfluger was "at home and mostly inactive outside the residence." Pfluger was observed bending at the waist to pick weeds from a flower garden, pulling an empty garbage can up the driveway, and retrieving her mail. Based upon this display of limited physical activity and the fact that Pfluger did not "display any outward signs of pain and discomfort," the investigator recommended using an independent medical examination ("IME") or "other investigative methods."

Noting Pfluger's ability to bend, walk freely, and pull an empty garbage can with one hand, Tad Hollworth, an Aetna employee, wrote a note requesting that someone (Hollworth does not identify the intended recipient of the note) "[p]lease comment re whether an IME or FCE would be beneficial." (Bates 314.) An FCE is a functional capacity evaluation. On May 22, 2001, "T Schmidt MD" wrote the following:

> Case Summary: 35 y/o claimant who carries a diagnosis of fibromyalgia, Chronic Fatigue, Low Level Graves, Migraines out on claim for several years. Claimaint use [sic] to work part-time with several references to cognitive dysfunction.

7

Recommendations and Considerations: File appears to support more evidence of subjective versus objective evidence of functional capacity impairment. Would suggest FCE and Rheumatology IME specifically asking about functionality, RTW even part-time. May consider neuro-psych testing in future after other workup finished with FCE and IME. Have Rheumatologist comment on cognitive ability. Obtain medical records past 9/24/01.

(Bates 313.) On May 29, 2001, Hollworth requested an IME and FCE for Pfluger. (Bates 303.)

On July 11, 2001, Pfluger participated in a functional capacity evaluation ("FCE") administered by Mary Jo Crist, OT who was employed by Occupational Health Systems. (Bates 1028-38.) According to Crist's summary, Pfluger reported that she was feeling fatigued at a level of 7 or 8 on a 0-10 scale upon arrival. Pfluger reported that she usually has discomfort in the area of the upper thoracic spine and bilateral elbows and that other joints could become painful with activity. During the course of weighted tasks, Pfluger reported feeling progressive fatigue with the appropriate muscle groups which required Crist to discontinue testing protocols. Regarding Pfluger's reports of progressive fatigue, Crist noted that Pfluger's reports of fatigue and pain during weighted tasks and positional tolerances were "meaningful," (Bates 1033-34), defined as follows: "This information is a valid component of information for determining functional abilities. It *fully* correlates with objective information." (Bates 1034.) Pfluger was able to sit for 45 minutes. As part of the FCE, Pfluger completed a questionnaire in which she states that she thinks she could easily put on a t-shirt, button a shirt, wash her hair, put on her socks, do dishes, and drive for 30 minute durations; with some difficulty, she thinks that she could sleep through the night, blow

8

dry her hair, lift a gallon of milk from the top shelf of the fridge, grocery shop, do the laundry, care for children, work in the garden, sit through a movie, play with small children, type or write several letters to friends, push/pull/open doors in public places, drive for 45 minute durations, walk and stand a total of 1.5 hours while shopping; she does not think that she could perform the following actions at all: vacuum, mow the lawn, paint a room, wash the floor on her hands and knees, wash the car, take out the garbage, climb a ladder and change a light bulb, light recreation, or swimming. (Bates 1036-38.)  After 1 hour and 45 minutes of testing (in her summary, Crist estimates approximately 2 hours), Pfluger requested a break and Advil for increased pain in the cervical and upper thoracic spine areas.  She reported pain to be at a level 10 on a 1-10 scale.  When asked if she felt that she could continue with the testing, Pfluger "became quite tearful . . . and stated that she wanted to finish the test but she did not feel it was in her best interest physically to continue.  She stated that she generally must rest when she feels this uncomfortable.  Therefore testing was discontinued at Mrs. Pfluger's request."  (Bates 1029.)  Aside from this information, Crist described Pfluger's report of progressive pain and fatigue as "subjective" and stated that "no objective pain behaviors were observed."  (*Id.*)  Crist added that "[w]hile testing was not completed, the level of work she was able to demonstrate fell within the light level category of work as defined by the U.S. Dept. of Labor's Dictionary of Occupational Titles."  (*Id.*)

On July 26, 2001, Pfluger attended an independent medical exam ("IME") administered by Dennis G. Brown, M.D., J.D.  (Bates 1047-55.)  Brown opined that "Ms.

Pfluger carries diagnoses of chronic fatigue syndrome and fibromyalgia. At this IME there were no objective findings supporting these diagnoses. Chronic fatigue syndrome and fibromyalgia are monikers or a psychosocial condition. They do not represent a biomedical condition – a specific illness of pathologic state." (Bates 1048-49.) For its part, Aetna asked Brown to answer a series of questions, three of which are specific to "objective findings." (Bates 1049.) During the examination, Pfluger complained of tenderness in a diffuse pattern at her cervical paraspinal muscles, upper trapezii, rhomboideus major, the thoracic paraspinal muscles, and upper lumbar paraspinal muscles bilaterally. Pfluger stated she has migraines four to five times per month and that she experiences intermittent (50 to 70 percent of the time) neck, bilateral shoulder, and back pain. She can experience pain in both arms and legs, and her symptoms worsen from activity. Under "Diagnosis," Brown writes, "[m]ultiple complaints." (Bates 1048.) Brown opined that Pfluger's condition did not restrict her at all from sitting, standing, walking, climbing, kneeling, reaching, or any other function. (Bates 1054-55.) According to Brown's estimation of Pfluger's physical abilities, Pfluger could walk continuously for 6 hours and lift in excess of 100 pounds and frequently lift or carry 50 pounds. (Bates 1054.) Brown's estimation of Pfluger's physical capabilities appears to be based upon his remark that "Ms. Pfluger did not have objective findings indicative of functional impairment." (Bates 1055.)

On August 2, 2001, Robert C. Porter, M.D., F.A.C.P.M., F.A.A.D.E.P. wrote a "clinical validation" addressed to Hollworth. (Bates 1057-58.) Porter qualified his opinion by stating that he only reviewed Pfluger's medical records from August and

September 2000 and that "prior medical records may provide additional information." (Bates 1057.) Porter stated that a conclusion could not be made from the FCE since it was discontinued. (*Id.*) However, Porter stated that neither Brown's IME nor the medical records from August and September 2000 demonstrated Pfluger's inability to complete the FCE. (Bates 1058.) Porter then opined:

> The fatigue may be related to deconditioning and a 3-4 week reconditioning program would be appropriate to elevate Ms. Pfluger from a light work level to an unrestricted level. The subjective complaints of pain and fatigue should not be considered evidence of decreased functionality. Return to work will not cause increased pathology with Ms. Pfluger. Return to work should be considered therapeutic for her condition.

(*Id.*)

In a letter dated October 10, 2001, Hollworth informed Pfluger that Aetna decided to terminate the benefits that Pfluger received under the Plan effective October 31, 2001. (Bates 609-11.) Hollworth wrote that Aetna completed a review of all of the information contained in Pfluger's claim file. Hollworth described some of the results of the FCE and IME. Hollworth also described his view of Dr. Steffen's Attending Physician Statement dated June 10, 2001:

> The Attending Physician Statement does not indicate a diagnosis or diagnoses. No objective findings are indicated to support the subjective complaints. No current treatment plan is indicated. No specific restrictions or limitations are noted. No mental/nervous or cognitive impairment is noted.
>
> Dr. Stefan [sic] did indicate that you are stabilized and improved. Dr. Stefan [sic] also stated that you have severe limitation of functional capacity. However, as stated above, no objective medical evidence was given to support the claimed limitation level. There was no mention of

11

current diagnosis of hyperthyroidism or migraine headaches and no summary of treatment for these conditions.

(Bates 610.) Hollworth stated that "the above-mentioned medical information" was compared to the physical and mental requirements of the occupation of tax manager and, Hollworth concluded, Pfluger has "the physical and mental capability" to perform the occupation of tax manager. (*Id.*) Hollworth finishes,

> In summary, the independent medical exam and functional capacity evaluation did not reveal any objective medical evidence to support your claimed level of disability. Additionally, the medical information provided by your physicians does not substantiate functional impairment to the extent you are unable to perform your own occupation as a manager.

(*Id.*)

Pfluger appealed Aetna's decision. In a letter dated December 5, 2001, attorney Philip A. Munroe, representing Pfluger, wrote Aetna an eleven-page letter arguing that Pfluger's disability payments should be reinstated. (Bates 728-38.) In his letter, Munroe argues that any "stabilization" in her symptoms can be attributed to her "amended lifestyle." (Bates 728.) Munroe argues that Pfluger's cognitive and memory skills are significantly impaired. Munroe also described the conclusions of the August 19, 1999 ALJ Decision. Munroe pointed out that the Attending Physician's Statements dated November 9, 1999, September 20, 2000, March 28, 2001, and June 10, 2001, indicate that Pfluger's condition has stabilized, not improved, and that Dr. Kristin A. Steffen reiterates that position in her most recent report dated November 15, 2001. Munroe argues that Aetna is estopped from claiming that Pfluger is not disabled because it provided Pfluger with representation in her Social Security claim and used

that award to reduce the amount of disability benefits that it paid Pfluger. With respect to the FCE, Munroe argues that Aetna, Brown, and Porter ignored aspects of the FCE that were favorable to Pfluger. Munroe also argues that the FCE did not measure Pfluger's ability to perform her job of tax manager because it did not test Pfluger's ability to perform the specific requirements of the position, and the FCE did not account for the occupation's requirements of mental alertness, handling of stress, and irregular work hours. With respect to the IME, Munroe argues that Brown mistakenly asserted that chronic fatigue syndrome and fibromyalgia are not recognized illnesses. Munroe also argues that the emphasis on objective medical evidence is misplaced because the Plan does not require that the illness that causes disability be documented by objective medical evidence. Munroe argues that Brown's review of Pfluger's medical records was limited. Munroe argues that Brown did not follow the diagnostic techniques used by the medical community for chronic fatigue syndrome. Munroe argues that Brown did not do any testing of Pfluger's physical abilities before concluding that Pfluger has no restrictions sitting, standing, walking, or lifting in excess of 100 pounds. With respect to Porter's evaluation, Munroe argues that the evaluation be disregarded because it was based on only two months of medical records over a nine-year period as well as the flawed FCE and IME. With respect to Dr. Steffen's report, Munroe argues that Steffen's November 15, 2001 report eliminates any confusion caused by any omissions in her earlier reports.

Steffen's November 15, 2001 report indicates that the June 6, 2001 report was incomplete but that the reports dated September 20, 2000, and March 28, 2001,

accurately reflect Pfluger's diagnoses of chronic fatigue syndrome, fibromyalgia, and migraine headaches. (Bates 1116-18.) Steffen lists the many therapies that Pfluger has used to treat her symptoms. Steffen states that Pfluger's condition may have "stabilized," meaning that she has not worsened and has not improved, but that she is not considered "cured," "healed," or "returned to normal." (Bates 1116.) Steffen states that Pfluger's physical limitations as well as cognitive impairments, including limited memory, difficulty concentrating, and difficulty thinking clearly, prevent her from working. Steffen disagrees with Brown's opinion that chronic fatigue syndrome and fibromyalgia are "monikers of a psychosocial condition - not a biomedical condition." (Bates 1117.) Steffen also states that the FCE only tested Pfluger's ability to perform physical activity over a short time period and did not measure whether Pfluger could maintain such activity over an entire work day. The FCE also did not measure Pfluger's subsequent fatigue and pain over five days as a result of the testing.

On December 11, 2001, Hollworth completed an "Aetna Disability Services Appeal Submittal Form" in which he stated that the reason for benefits termination was "no objective medical evidence to support ee's inability to perform her own occ." (Bates 617.) Hollworth directed that medical records, the IME report, and the functional demands profile form be sent to the appeals unit.

On April 17, 2002, David W. Dickison, D.O. reviewed Pfluger's medical file and could not find support for a diagnosis of fibromyalgia, but Dickison opined that Pfluger likely meets the chronic fatigue syndrome case definition and experiences migraine cephalgia that could cause occasional short-term impairment from work (1-2 days per

14

month). (Bates 1122-23.) Dickison found it "interesting" that the IME and FCE disclosed no sign of muscle atrophy or reduced grip strength. (Bates 1123.) Dickison also found it interesting that Pfluger reported that she could drive a car for 30 minutes but was unable to tolerate elevated reach for more than 2.5 minutes. Dickison states that Pfluger did not demonstrate "apparent pain behavior (assumed to mean grimacing, groaning, apprehension etc.)" during the FCE even though Pfluger reported experience moderate pain. (*Id.*) Dickison found the notations regarding the correlation between subjective and objective findings "puzzling." (*Id.*) Dickison pointed out that Pfluger reported an ability to walk a mile in 1998 and went through pregnancy to term in 2000. Dickison states that there is no test for chronic fatigue syndrome. Dickison states that it is possible, however, to objectively measure Pfluger's cognitive ability and performance, but Dickison suspected that Pfluger might be resistant to this approach since she refused individual and group therapy in 1996. According to Dickison, psychological evaluation is recommended as part of the standard assessment of chronic fatigue syndrome cases. Dickison concludes that the evaluation by Dr. Moran does not support cognitive impairment. Dickison concludes that Pfluger's impairment is based on self-reported symptoms and there are "no objective findings" that indicate Pfluger is unable to perform the essential physical requirements of a sedentary to light range job including that of an accountant. (*Id.*) With respect to cognitive demands of Pfluger's former occupation, Dickison writes, "It is unclear whether she is currently able to meet the *cognitive demands* as she reports; evidence to the contrary has not been presented." (*Id.*) He writes, "Regarding the question of psychological evaluation,

neuropsychological assessment with measures of cognitive abilities may help quantify her reported impairment. If Ms. Pfluger undergoes such evaluation, review by a neuropsychologist is suggested." (*Id.*) With respect to Brown's IME and Porter's evaluation, Dickison writes, "Regarding the 8/01/01 IME and 8/2/01 file review, the providers apparently had limited information (minimal records). It is unlikely these represent complete and impartial evaluations." (*Id.*)

On April 25, 2002, Melvyn Attfield Ph.D. answered the following question posed by Aetna: "Does the report/evaluation by John Moran PhD (2/18/98) support cognitive impairment?" (Bates 312.) Attfield submitted the following answer:

> Thank you for the opportunity to review this information. Dr. Moran completed a brief mental status examination and a review of mental efficiency across a variety of cognitive domains. He did not conduct a comprehensive neuropsychological evaluation, transform his results (age, gender, education) or attempt any comparison with normative data. Although Dr. Moran's assessment might (broadly) be covered under the term 'quantified clinical assessment,' the results do not support a psychogenic or neurogenically mediated impairment.

(*Id.*) Attfield concluded that "Dr. Moran's evaluation does not support cognitive impairment." (*Id.*)

On June 13, 2002, Aetna employee Tammy Williams wrote a letter to Munroe indicating that Aetna decided to uphold the denial of benefits. (Bates 626-30.) Williams states that the issue is whether Pfluger has the ability to perform the material duties of her own occupation as it exists in the general economy. Williams states that Aetna terminated Pfluger's benefits because "we found that the file did not contain any objective documentation to substantiate the level of impairment claimed by Ms. Pfluger

and her treating physician, Dr. Steffen." (Bates 627.) Williams continues, "Ms. Pfluger's claim was closed after it was established that her own occupation was within her physical and mental ability." (*Id*.) Williams states that Dr. Moran's February 18, 1998 report is the only assessment in the record of Pfluger's cognitive ability and that Attfield determined that Dr. Moran's report did not support cognitive impairment. Williams writes, "It does not appear that any of Ms. Pfluger's treating physicians felt her to be so cognitively impaired and to require any diagnostic testing to rule out any organic or emotional causes." (*Id*.) Williams refers to other comments in Dickison's report, including the alleged lack of support for a fibromyalgia diagnosis, the lack of muscle atrophy, the alleged inconsistency of Pfluger's reported ability to drive for 30 minutes and her inability to tolerate elevated reach for only 2.5 minutes, Pfluger's ability to bring her pregnancy to term and to care for an infant. Williams also repeats Dickison's comment that there is no test for chronic fatigue syndrome and repeats Dickison's conclusion that there are no "objective findings" to support Pfluger's self-reported physical impairment. Williams states that Aetna does not dispute that Pfluger "experiences symptoms," but Aetna believes "that it has not been demonstrated that [Pfluger's] symptoms are of such a severity as to preclude her from performing the duties of her own occupation" and that Pfluger has provided "no clinical evidence whatsover" to support an impairment of cognitive and memory skills. (Bates 628.) Williams states that Aetna is not estopped from claiming that Pfluger is no longer disabled because Aetna's determination of Pfluger's eligibility for Plan benefits is a determination separate from the Social Security Administration's determination that

17

Pfluger is disabled. With respect to Munroe's critique of the FCE, IME and Porter report, Williams counters, "you have not submitted any specific medical evidence, based on an examination of your client, which would refute the findings of the medical professionals on which Aetna has relied." (Bates 629.) Williams concludes, "[t]he presence of a diagnosis or condition alone is not sufficient to qualify for disability benefits. It must be shown that a claimant's condition results in symptoms of such severity that he or she is prevented from working." (*Id.*)

Pfluger filed this action on July 28, 2003. On September 17, 2004, the court granted the plaintiff leave to serve named defendants that she had not already served. The court also granted the plaintiff's motion to compel and denied Aetna's motion to quash. The court determined that the Plan did not confer discretion upon Aetna regarding long-term benefit eligibility and that the court must review *de novo* the termination of Plan benefits. On December 8, 2004, the court denied Aetna's motion for reconsideration. On March 22, 2006, Aetna filed a motion for summary judgment. Aetna also moved to strike the plaintiff's declarations. The motion for summary judgment and the motion to strike are fully briefed.

## ANALYSIS

### I. Motion to Strike

Defendants move to strike the declarations of Anne E. Pfluger, Kristin A. Steffen, M.D., and Paul D. Matson, all filed by the plaintiff in opposition to defendants' motion for summary judgment, because they contain information that was not submitted to the Plan. "Deferential review of an administrative decision means review on the

18

administrative record," *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection*, 195 F.3d 975, 981-82 (7th Cir. 1999), and when review under ERISA is deferential, judicial review is limited to evidence that was submitted in support of application for benefits. *Id.* at 982. Upon *de novo* review, however, parties may take discovery and present new evidence. *Id.*; *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1098-99 & n.4 (7th Cir. 1994). In *Casey*, the Seventh Circuit held that, upon *de novo* review, a district court may consider evidence not presented to the plan administrator. 32 F.3d at 1099 n.4. "Therefore, in its *de novo* review the district court may limit the evidence to the record before the plan administrator, or it may permit the introduction of additional evidence necessary to enable it to make an informed and independent judgment." *Id.* at 1099. Without mentioning a limitation upon the court's discretion, some courts within the Seventh Circuit cite *Casey* for the proposition that a district court may consider evidence not presented to the plan administrator, *see Samas v. Anthem Health & Life Ins. Co.*, 2003 WL 22176080, *7 (N.D. Ill. Sept. 15, 2003); *Bowman v. Reliance Standard Life Ins. Co.*, 2003 WL 1524476, *5 (N.D. Ill. Mar. 21, 2003), while others emphasize the limitation that a court should only consider the additional evidence if it is necessary to make an informed and independent judgment, such as when the administrator's record is insufficient. *Wheatley v. American United Life Ins. Co.*, 792 N.E.2d 927, 931 (Ind. App. Ct. 2003). The court has previously determined that *de novo* review applies to the interpretation of the Plan. (*See* Orders, Sept. 17, 2004, and Dec. 8, 2004.)

19

In this case, there is little practical consequence to the defendants' motion to strike the declarations because, as the defendants repeatedly note, the administrative record and the declarations largely contain the same information. (*See* Defs.' Br. 5-8, May 15, 2006; Defs.' Reply Br. 4-5, Jun. 8, 2006) (stating that the declarations are not "necessary" to conduct an adequate review.) Pfluger's declaration contains information about her condition and her work requirements, (Defs.' Br. 4, 6); Steffen's declaration contains information about chronic fatigue syndrome, (*id.* at 4, 7); and Matson's declaration contains information about Pfluger's work requirements. (*Id.* at 4, 8.) There would be no harm in considering information about chronic fatigue syndrome and Pfluger's work requirements because they do not "augment the administrative record with new facts." *Gallo v. Amoco Corp.*, 102 F.3d 918, 923 (7th Cir. 1996). Nevertheless, after reviewing the declarations submitted on behalf of Pfluger, the court believes that it need not consider the declarations for the purposes of deciding the defendants' pending motion for summary judgment. The court will exercise its discretion by granting the defendants' motion to strike the declarations.

## II. Motion for Summary Judgment

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the

20

nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."

*Id.* at 255. Any doubt as to the existence of a material fact is to be resolved against the

moving party. *Anderson*, 477 U.S. at 255.[4]

The court has previously determined that *de novo* review applies to the

interpretation of the Plan. (*See* Orders, Sept. 17, 2004, and Dec. 8, 2004.) Under *de*

*novo* review, the court does not ask whether the administrator's decision is arbitrary or

capricious; rather, the court determines whether the defendants' decision to deny the

plaintiff benefits was correct. *Wilczynski v. Kemper Nat'l Ins. Cos.*, 178 F.3d 933, 935

(7th Cir. 1999). Therefore, the court must deny the defendants' motion for summary

judgment if, based upon Pfluger's evidence and all reasonable inferences derived

therefrom, a fact finder[5] could reasonably determine that the termination of benefits

was incorrect. In this instance, the termination of benefits would be incorrect if Pfluger

could not perform the material duties of a tax manager position.

Accepting Pfluger's evidence as true as the court must on a motion for summary

judgment, Pfluger has presented sufficient evidence that she could not perform the

material duties of the tax manager position. In 1996, Aetna determined that Pfluger

---

[4]The parties agree that the court should review the defendants' motion for summary judgment under Federal Rule of Civil Procedure 56, and the court will accommodate the parties' request. However, the court notes that the parties might have proceeded by a trial on the papers under Federal Rule of Civil Procedure 52(a). *See Crespo v. Unum Life Ins. Co. of America*, 294 F. Supp. 2d 980, 991-92 (N.D. Ill. 2003) (recommending that the parties proceed by a trial on the papers, rather than motions for summary judgment, in ERISA benefits cases).

[5]At trial, the court will be the fact finder because jury trials are not available in actions brought under § 1132(a)(1)(B), the only claim in this case. *See Bugher v. Feightner*, 722 F.2d 1356, 1360 (7th Cir. 1983); *Wardle v. Central States, Southeast and Southwest Areas Pension Fund*, 627 F.2d 820, 828-30 (7th Cir. 1980). In conducting a *de novo* review, the Court must "arrive at its own factual findings in determining whether benefits were properly denied." *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994). "[T]he appropriate proceedings for such fact-finding is a bench trial and not the disposition of a summary judgment motion." *Id.*

was partially disabled under the terms of the Plan, and in 1997, Aetna determined that Pfluger was totally disabled. Pfluger has submitted evidence that her condition and impairment level have not improved since Aetna's earlier determinations that Pfluger qualified for Plan benefits. Specifically, Steffen, Pfluger's treating physician, wrote in a November 15, 2001 letter that Pfluger has not improved; that Pfluger's treatment involves limiting her activity level, getting plenty of rest and sleep; that Pfluger's capabilities limit her to "no employment, limited to minimal activity, and rest to prevent exacerbation of symptoms"; that Pfluger has trouble with "limited memory, difficulty concentrating, and difficulty with thinking clearly"; that Pfluger's cognitive impairments and physical limitations prevent her from working; and that Pfluger rested for the remainder of the day without doing any activity following the FCE and that Pfluger's fatigue and pain were heightened for five days following the FCE. (Bates 1119-20.) Steffen concluded that Pfluger was "symptomatic and debilitated" and "totally disabled at this point due to her chronic fatigue syndrome and fibromyalgia." (Bates 1120.) If Pfluger's condition has not improved since 1997, the fact finder might reasonably conclude that Aetna's 2001 decision to terminate Plan benefits is inconsistent with its past determinations. Moreover, based upon Steffen's opinion, that same fact finder might also reasonably conclude that Aetna's 1996 and 1997 decisions were correct while their decision to terminate Pfluger's benefits in 2001 was incorrect. Therefore, it should come as no surprise that on the state of the record before the court defendants' motion for summary judgment must be denied.

Citing *Olson v. Comfort Systems USA Short Term Disability Plan,* 407 F. Supp. 2d 995 (W.D. Wis. 2005), the defendants suggest that the court should disregard Steffen's November 15, 2001 letter because it contains only conclusory assertions of disability. (*See* Defs.' Br. 12-13; Defs.' Reply Br. 7.) *Olsen* is distinguishable in at least two respects. First, in the present action, the court is employing a different procedural approach than the *Olsen* court employed. In *Olsen*, the court stated that "[t]he record contains evidence favorable to both parties," but that "defendant's position is stronger." 407 F. Supp. 2d at 1012. The court concluded that the defendant's decision to deny benefits was "supported by a preponderance of the evidence." *Id.* at 1013. This approach is more akin to a trial on the papers under Rule 52 than a determination using the standard for summary judgment set forth in Rule 56, as a judge should not weigh evidence or determine the truth of the matter in ruling upon a motion for summary judgment. *See Anderson*, 477 U.S. at 249*; Outlaw v. Newkirk*, 259 F.3d 833, 836-37 (7th Cir. 2001). Although it is appropriate in some circumstances to proceed under a Rule 52 standard, *see Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001), the court elects not to do so in this case because no party invoked Rule 52, no party explicitly waived a right to trial, no party made it reasonably clear that it did not want a trial, the parties did not agree to a stipulated set of facts, and the plaintiff wishes to present evidence outside of the administrative record. *See Cook Inc. v. Boston Scientific Corp.*, 333 F.3d 737, 741-42 (7th Cir. 2003) (employing Rule 52(a) standard only after it became "reasonably clear" that a party did not want a trial); *May v. Evansville-Vanderburgh Sch. Corp.*, 787 F.2d 1105, 1115-16 (7th Cir. 1986)

(employing Rule 52(a) standard only after party made it explicitly clear that she waived her right to trial); *Marshall v. Blue Cross Blue Shield Ass'n*, 2006 WL 2661039,*2 (N.D. Ill. Sept. 13, 2006) (providing parties notice that the court intended to proceed under Rule 52 and affording the parties an opportunity to object to the procedure).

The facts in *Olsen* are also distinguishable from the facts in this case in a number of ways. For example, the *Olsen* court discounted the reports of the plaintiff's treating physician because they did not contain an analysis of the plaintiff's material job duties. 407 F. Supp. 2d at 1012. In this case, the plaintiff's material job duties are not in dispute, and if Steffen's assessment of Pfluger's symptoms and limitations are accurate, there is no question that Pfluger could not perform the material duties of her job. Pfluger has a long treatment history. During that history, Pfluger's treating physicians determined that she could not perform the material duties of her position, and Aetna agreed. Aetna argues that Pfluger's condition has improved (or at least that Pfluger has not shown that her limitations are as severe as they once were); Aetna does not argue that Pfluger could still perform the material duties of her position even if she were as limited by her fatigue and pain as she claims. Also, the *Olsen* court weighed the reports of the treating physician against "a report from a neurologist who found no problems with plaintiff's memory" and "notes from two physical therapists" indicating that the plaintiff could perform complete aerobic activities. *Id.* at 1013. In this case, Aetna did not require Pfluger to submit to a neurological assessment even though it was counseled to do so by two of its consultants, (*see* Bates 313, 1123), and as the court will discuss below, unlike the physical therapy notes in *Olsen*, the FCE in

24

this case does not offer strong support, if any, of Pfluger's ability to perform her occupation. Therefore, even if the court were to weigh the evidence as the *Olsen* court did, the evidence in this case is not as favorable to the defendants as the evidence in *Olsen*.

The defendants argue that Steffen's opinions, at least the opinions articulated in the November 15, 2001 letter, are conclusory and unsupported by her treatment notes or by "documentation of any test." (Defs.' Br. 12.) The defendants, however, do not move to strike the November 15, 2001 letter or otherwise suggest that Steffen's opinions are inadmissible; rather, the defendants argue that Steffen's opinions are merely unpersuasive and that the termination of benefits is "adequately supported by a preponderance of the evidence." (Defs.' Br. 13.) The defendants' argument is off the mark because, as the court previously noted, the court does not weigh evidence upon a motion for summary judgment. Instead, the court believes the evidence of the non-moving party and draws all reasonable inferences in the non-moving party's favor. At trial, the defendants are free to assail the bases of Steffen's opinions, although the court suspects the opinions are based upon frequent examinations of Pfluger as well as Pfluger's medical file, a stronger foundation than the opinions of Brown and Porter.

The court also adds that the defendants' criticisms of Steffen's opinions apply with equal force to the opinions of their own consultants. If Steffen's opinions are conclusory assertions, so is the opinion of Brown that "chronic fatigue syndrome and fibromyalgia are monikers of a psychosocial condition" or the opinion of Porter that Pfluger's return to work would not cause increased pathology and should be

25

considered "therapeutic."  Also, it is undisputed that neither Brown nor Porter (and perhaps none of the consultants) reviewed the material duties of Pfluger's position.  If the lesson of *Olsen* is that a consultant must analyze the material duties of the plaintiff's position, the opinions of the defendants' consultants fail that test.  Finally, Aetna criticizes Steffen's opinion concerning Pfluger's cognitive impairments because it is not supported by a "test."  Hollworth's October 10, 2001 letter, however, concludes that Pfluger has "the mental capacity to perform [her] occupation" without any analysis and without reference to any medical record, much less a neuropsychological assessment.  (*See* Bates 610.)

Aside from arguing that the court should disregard Steffen's opinion, Aetna argues that Pfluger's condition has improved over the years.  As its proof, Aetna argues that none of the Attending Physician's Statements between November 1999 and October 2001 indicate any mental impairment or inability to deal with stress.  With respect to Pfluger's physical impairments, Pfluger was observed shoveling snow, carrying a watermelon, driving, maintaining a successful pregnancy and caring for a young child.  Aetna also relies on the FCE, the IME, and the opinions of consultants Porter, Dickison, and Attfield to show that Pfluger was able to perform the material duties of her occupation of tax manager.

Aetna's argument that Pfluger's condition has improved only creates a genuine issue of material fact that this court should not resolve on summary judgment. Steffen's opinion that Pfluger has not improved is sufficient to overcome the defendants' motion for summary judgment, especially when viewed in the context of the

opinions of Pfluger's past treating physicians (e.g. Rigden and Michael) and Aetna's previous determinations that Pfluger was totally disabled under the terms of the Plan. Additionally, as the court will discuss below, portions of the FCE, IME, and opinions of Aetna's consultants also suggest that Aetna's decision to terminate Pfluger's benefits was erroneous, creating genuine issues of fact. To further illustrate the appropriateness of denying the defendants' motion for summary judgment, the court addresses the defendants' arguments in turn.

Aetna first argues that none of the Attending Physician's Statements between November 1999 and October 2001 indicate any mental impairment or inability to deal with stress. Aetna suggests that the lack of mention of a cognitive impairment means that Pfluger did not have a cognitive impairment, or at least, that no Aetna employee was reasonably alerted to the possibility that Pfluger had a cognitive impairment. Although no Aetna employee or consultant found the November 1999-October 2001 time frame significant during the administrative appeal, Aetna may defend the termination decision with "any arguments that bear upon its rationality" so long as Aetna does not augment the record with new facts or provide a justification inconsistent with the reason it gave the applicant. *Gallo*, 102 F.3d at 923. The court, therefore, does not disregard Aetna's *post hoc* rationalization as it would if it were made in defense of an agency action. *See, e.g., Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 50 (1983). Nevertheless, the court does not understand why it should carve out and focus only on that portion of the administrative file that excludes any mention of cognitive impairment.

27

Perhaps some of the older documents in the administrative file may no longer reflect Pfluger's current impairments, but the ALJ decision, which noted Pfluger's cognitive impairments, was issued only a few months prior to the November 1999 Attending Physician Statement. Why consider the November 1999 statement and not the ALJ decision? Even if the court were to determine that the ALJ decision did not put Aetna on notice of Pfluger's cognitive impairments in 2001, Schmidt's May 22, 2001 note that Pfluger's medical file contains "several references to cognitive dysfunction" certainly should have provided Aetna with notice of potential cognitive impairment.

The second problem with the argument is that a reasonable person may draw more than one inference from the omission of information. The defendants assume that the missing mention of any cognitive difficulties means that Pfluger had recovered and that she would not experience any cognitive impairment if she were placed back into her tax manager position. Under this view, Pfluger's cognitive difficulties may have been "cured" sometime during the three-month period between the ALJ's decision and the first Attending Physician Statement in November 1999 that omitted mention of mental impairment. However, the lack of any discussion regarding Pfluger's mental impairments may also be explained by the fact that she was no longer in the environment that taxed her cognitive abilities. In other words, her cognitive impairments may be readily apparent when she performs the functions of a tax manager but may not disrupt her daily functioning when the most cognitively challenging task she performs is shoveling snow or weeding a garden. Munroe made this point in Pfluger's letter of appeal when he stated that any "stabilization" in her

28

symptoms can be attributed to her "amended lifestyle." At least upon consideration of a motion for summary judgment, the court must draw this inference in favor of Pfluger.

Aetna's surveillance reports also raise disputed issues of fact regarding Pfluger's physical capabilities. Does Aetna believe that Pfluger was unable to carry a watermelon or shovel snow, at least briefly, in 1997 when it found Pfluger totally disabled under the terms of the Plan? Pfluger's ability to bend at the waist or to pull an empty garbage can the length of her driveway are not inconsistent with Pfluger's original physical limitations of needing to take frequent and prolonged breaks during the day due to prolonged fatigue after minimal effort, difficulty sleeping, muscle aches and pains, fever, sore throat, and generalized muscle weakness as well as her incapacity due to migraine headaches. *See Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004) (noting "the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week"). Pfluger's main physical limitations were her fatigue and corresponding need to take breaks, limitations that interfered with an occupation that requires high mental alertness, high stress/pressure, and irregular work hours. Pfluger's occupation is admittedly not physically demanding and her ability to bend at the waist or to pull an empty garbage can for a moment was never the issue. Pfluger did not claim disability based upon a complete inability to push, pull, or lift; rather, she claimed disability based upon the frequency and length of the fatigue that she experienced as well as corresponding cognitive and physical impairments. In this case, the surveillance reports recorded a snapshot of unremarkable physical activity; they did

29

not capture information that belies Pfluger's reported fatigue or impairments. *See Carradine*, 360 F.3d at 755-56 ("Carradine does not claim to be in wracking pain every minute of the day. When she feels better for a little while, she can drive, shop, do housework. It does not follow that she can maintain concentration and effort over the full course of the work week."). Aetna also references Pfluger's ability to bring a pregnancy to term and ability to care for a small child, but nothing in the record compels the court to conclude that carrying a pregnancy to term is inconsistent with Pfluger's claimed physical limitations. Similarly, nothing in the record demonstrates that Pfluger does not need frequent and prolonged breaks in the course of caring for her child. The court notes that the declarations that it struck upon Aetna's motion include articles related to pregnancy and chronic fatigue syndrome. If Aetna raises the issue of Pfluger's pregnancy at trial, the court will allow the Pfluger the opportunity to present evidence in response because Pfluger's pregnancy was mentioned only in Aetna's denial of Pfluger's appeal and Pfluger was not put on notice that she had to rebut such an argument during the administrative appeal.

The FCE, IME, and opinions of consultants Porter, Dickison, and Attfield are fraught with qualifications, inconsistencies, and even information favorable to Pfluger. Starting with the FCE, Porter wrote that a conclusion could not be made from the FCE because it was discontinued. Despite this opinion from its own consultant, Aetna relied on the FCE in Hollworth's October 10, 2001 letter and in Williams' June 13, 2002 letter without explaining why it disregarded that particular portion of Porter's opinion. Similarly, Dickison opined that both Brown's IME and Porter's evaluation were based

30

upon "limited information (minimal records)" and were likely not "complete and impartial evaluations." (Bates 1123.) Nevertheless, Williams did not mention that particular opinion in her June 13, 2002 letter nor has Aetna addressed Dickison's criticism of the IME and Porter's evaluation in any brief before this court despite Aetna's continued reliance on those evaluations.

Pfluger's arguments concerning the FCE were not addressed in Williams' letter or in briefs submitted to this court. Through attorney Munroe, Pfluger argued that the FCE did not measure Pfluger's ability to perform the specific duties of her job of tax manager, including the occupation's requirements of mental alertness, handling of stress, and irregular work hours. The FCE tested Pfluger's ability to perform weighted tasks and tolerance tests, but it did not measure her ability to perform those tasks over an entire work day nor did it fully measure Pfluger's fatigue and pain as a result of performing the tasks during the FCE. Pfluger requested medication and reported that she was unable to complete the weighted tasks, the positional tolerance tests, and the remainder of the FCE after one hour and 45 minutes of testing due to pain and fatigue. If a fact finder were to accept Pfluger's reports of fatigue and pain at face value and conclude that Pfluger was not exaggerating her symptoms, how does the FCE demonstrate that Pfluger could perform light work over an entire work day? No Aetna employee answers this question, yet Hollworth concludes that Pfluger was able to perform light work without considering her ability to sustain light work over any period of time.

Aetna and its consultants place undue emphasis upon other aspects of the FCE. For example, Dickison finds it "interesting" that Pfluger reported an ability to drive a car for 30 minutes but an inability to tolerate elevated reach for more than 2.5 minutes. Dickison suggests a contradiction, but what kind of car does Dickison drive that requires him to sustain an elevated reach for more than 2.5 minutes? Dickison writes that one might have expected muscle atrophy and muscle strength loss, but the terminating factor for almost every weighted task and positional tolerance in the FCE was either progressive fatigue or pain. Pfluger may very well have sustained muscle strength loss, and the FCE does not indicate otherwise.

Munroe also pointed out that the FCE contains information favorable to Pfluger that neither Brown, Porter, nor Hollworth noted. For example, Crist noted that Pfluger's reports of fatigue and pain during weighted tasks and positional tolerances were "meaningful," meaning that Pfluger's reports "**fully** correlate[] with objective information." (Bates 1033-34.) This suggests that Crist did not believe that Pfluger was malingering or exaggerating her fatigue. However, no Aetna employee or consultant noted this aspect of the FCE aside from Dickison who found the information "puzzling."

What is puzzling about the FCE are the references to "objective information." In another portion of the FCE, Crist writes that "no objective pain behaviors were observed," but Crist does not define "objective pain behaviors." If "objective pain behaviors" include "grimacing" and "groaning" as Dickison assumes, the behaviors are neither objective nor a foolproof indicator of pain: one can grimace and groan while

experiencing no pain and one can experience pain without grimacing and groaning. Should the court disbelieve Pfluger's reports of pain because she did not wail during the FCE? Crist's comment that "no objective pain behaviors were observed" has limited value because it is vague, and it is inconsistent with Crist's notation that Pfluger's reports of fatigue and pain fully correlate with "objective information." Despite this, Brown, Porter, Hollworth, Dickison, and Aetna's briefs filed in this court seize upon one of Crist's references to "objective evidence," affording it great significance without explaining its meaning, while ignoring entirely the other reference to "objective" evidence in the FCE that is favorable to Pfluger. Aetna makes repeated references to the lack of "objective" evidence in support of Pfluger's diagnoses and claimed impairments. However, as Munroe points out in Pfluger's administrative appeal letter, the Plan does not require that Pfluger's disability or her level of impairment be documented by "objective" medical evidence. Courts have rejected such a requirement because some symptoms, like pain and fatigue, cannot be measured directly by an objective test. *See Carradine*, 360 F.3d at 753 (stating that social security disability law does not require "objective" medical findings to show disability); *Hawkins v. First Union Corporation Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003) (stating that "subjective" evidence of pain and fatigue may show disability otherwise "fibromyalgia could never be shown to be totally disabling").

There is a genuine issue of material fact as to whether the defendants erroneously based the termination of Plan benefits upon Pfluger's inability to provide "objective" medical findings to corroborate her reported fatigue and pain. In its

submissions to this court, Aetna argues that it did not require Pfluger to provide objective findings to support her diagnoses. (Defs.' Reply Br. 16.) The record, however, demonstrates that Aetna placed a heavy reliance on objective evidence to support Pfluger's diagnoses and impairments. Crist reported that Pfluger reported "no objective pain behaviors"; Brown stated that there were no "objective findings" to support Pfluger's diagnoses of fibromyalgia and chronic fatigue syndrome; Aetna requested that Brown answer questions specific to "objective findings"; Brown stated that Pfluger did not have "objective findings" indicative of functional impairment; Porter stated that Pfluger's "subjective" complaints of pain and fatigue should not be considered evidence of decreased functionality; Hollworth stated that no "objective findings" supported Pfluger's "subjective" complaints; Hollworth stated that no "objective medical evidence" supported Pfluger's claimed disability level; on December 11, 2001, Hollworth indicated that the reason for the termination of Pfluger's benefits was "no objective medical evidence to support ee's inability to perform her own occ."; Dickison wrote that there were no "objective findings" that Pfluger was unable to perform the physical requirements of her job; Williams wrote that Aetna did not find any "objective documentation" to substantiate the level of impairment claimed by Pfluger and her treating physician; Williams states that there are no "objective findings" to support Pfluger's self-reported physical impairment. There is considerable evidence in the record to suggest that the defendants required Pfluger to provide "objective" evidence of her fatigue and pain, an impossible task.

34

Aetna also argues that the FCE and the IME did not include testing of mental impairment because "there was no indication that [Pfluger] was claiming any mental impairment until after her benefits had been terminated." (Defs.' Reply Br. 12.) At a minimum, the defendants had three separate indications that Pfluger claimed mental impairment prior to the termination of her benefits: 1) the treating notes of her physicians between March 1996 and November 1999 upon which Aetna based two separate determinations that Pfluger was disabled; 2) the ALJ's August 19, 1999 decision that discussed Pfluger's diminished concentration and memory as a result of her fatigue; and 3) Aetna consultant Schmidt's May 22, 2001 mention of "several references to cognitive dysfunction" and recommendation that a rheumatologist "comment on cognitive ability." During the administrative appeal, Dickison writes that it is "unclear" whether Pfluger is able to meet the cognitive demands of her position; Dickison writes that it is possible "to objectively measure cognitive ability and performance" and that "a neuropsychological assessment with measures of cognitive abilities may help quantify her reported impairment." Despite recommendations by Schmidt and Dickison that Pfluger's cognitive abilities be tested, the defendants neither required Pfluger to submit to a test nor put her on notice that she was required to supply such test results. Instead, Hollworth analyzed one attending physician statement dated June 10, 2001, and stated that "no mental/nervous or cognitive impairment is noted." Hollworth writes that he considered the mental requirements of Pfluger's occupation and determined that Pfluger had the mental capacity to perform her occupation. But what specific mental requirements did Hollworth consider and

what was the basis for his determination that Pfluger had the mental capacity to perform her occupation? Hollworth's letter does not say. Williams writes that Pfluger has provided "no clinical evidence" to support an impairment of cognitive and memory skills; Williams cites to Attfield's opinion that Dr. Moran's 1998 evaluation does not support cognitive impairment; and Williams writes that Pfluger's treating physicians must not have believed Pfluger to be cognitively impaired because they did not order any diagnostic testing to rule out organic or emotional causes. Williams' last deduction is clearly wrong: Steffen, Pfluger's treating physician, clearly believed that Pfluger suffered from cognitive impairments that prevented her from performing her occupation of tax manager. Pfluger may not have provided the results of any "diagnostic testing" or "clinical evidence" because the Plan does not specify that an employee's disability must be supported by such evidence and Aetna did not inform of Pfluger of such a deficiency in her medical documentation. In fact, Aetna accepted similar evidence of cognitive impairment when it determined that Pfluger was disabled (e.g. treatment notes written by Rigden and Michaels), and Pfluger received benefits for years without Aetna requiring additional tests of cognitive impairment. For the first time, in Williams' letter, Aetna informed Pfluger that Dr. Moran's 1998 evaluation does not support cognitive impairment. Moran's evaluation may not present powerful evidence of Pfluger's cognitive impairments, but Pfluger was not warned prior to the termination of her benefits that the defendants had a change of heart regarding the value of Moran's report or their view of Pfluger's cognitive abilities. The defendants assisted Pfluger in demonstrating that she was disabled in 1999, and the defendants benefitted from the

36

ALJ's decision that Pfluger was disabled. The ALJ relied upon Dr. Moran's opinion that Pfluger's chronic fatigue syndrome would interfere with her concentration and memory over the course of an entire work day and work week. Now, by attacking the very evidence that persuaded the ALJ, the defendants "repudiate[] the basis of their first victory in order to win a second victory." *Ladd v. ITT Corporation*, 148 F.3d 753, 756 (7th Cir. 1998). Though the ALJ's touchstone was disability as defined by statute rather than disability as defined by the Plan, the court agrees that the defendants' change in position regarding the adequacy of Moran's report in particular and Pfluger's claim of disability in general "casts additional doubt" on the decision to terminate Pfluger's benefits under the Plan. The defendants concede that such a change in positions "would go on the scale" to determine the "correctness" of the termination decision. (Defs.' Reply 10-11.) *Ladd* does not prevent the defendants from arguing that Pfluger's condition improved since the ALJ's decision, but that remains a disputed issue of fact.

Accordingly,

**IT IS ORDERED** that the defendants' motion for summary judgment be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the defendants' motion to strike be and the same is hereby **GRANTED**.

Dated at Milwaukee, Wisconsin, this 16th day of January, 2007.

BY THE COURT:

s/J.P. Stadtmueller
J.P. STADTMUELLER
U.S. District Judge